# In The United States Court of Federal Claims

No. 07-613C

(Filed Under Seal: May 20, 2010)

Reissued: June 9, 2010[1]

_____

| | |
|---|---|
| NORTHROP GRUMMAN COMPUTING SYSTEMS, INC., | * * |
| Plaintiff, | * Cross-motions for summary judgment; * Government contract case; Internet * intercept software leasing agreement; |
| v. | * Genuine questions of material fact; * Motions denied. |
| THE UNITED STATES, | * * |
| Defendant. | * |

_____

**OPINION**

_____

*David C. Aisenberg*, Looney, Cohen, Reagan & Aisenberg, LLP, Boston, MA, for plaintiff.

*Armando A. Rodriguez-Feo*, Commercial Litigation, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General Tony West, for defendant.

**ALLEGRA, Judge**:

Plaintiff, Northrop Grumman Computing Systems, Inc. (Northrop), brings this action seeking damages for the alleged breach of an agreement with the Department of Homeland Security, Bureau of Immigration and Customs Enforcement (DHS/ICE).[2] Under that agreement, Northrop leased surveillance software to DHS/ICE to be used in intercepting the internet

___

[1] An unredacted version of this opinion was issued under seal on May 20, 2010. The opinion issued today incorporates the majority of the parties' proposed redactions and corrects some minor typographical errors. The redacted material is represented by brackets [ ].

[2] The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002), created the Department of Homeland Security (DHS). The Act also consolidated the United States Immigration and Naturalization Service and the United States Customs Service into a newly-formed Bureau of Immigration and Customs Enforcement, which is now known as United States Immigration and Customs Enforcement (ICE).

communications of the targets of criminal investigations arising under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.* The case is pending before the court on the parties' cross-motions for summary judgment under RCFC 56. Because there are genuine issues of material fact, the court denies the cross-motions and will set this case down for trial.

**I.**

Prior to entering into the lease agreement, DHS/ICE used other software to gather evidence, during a criminal investigation, of a subject's internet usage. This software, however, could capture data only from [] and thus could not []. In September of 2004, DHS/ICE decided that it needed software that could overcome this [] limitation. After conducting market research, it chose Northrop's Internet Observer software, also known as the Oakley software. That software, unlike [the prior] software, was [].

To acquire the right to use this software, DHS/ICE relied on a preexisting contract it had with plaintiff – Contract No. NAS5-01143 (the SWEP III contract). Pursuant to this contract, on September 24, 2004, DHS/ICE awarded Delivery Order COW-4-D-1025 (Delivery Order), leasing from plaintiff the Oakley software and obtaining associated equipment, technical support and training. The Delivery Order provided that plaintiff would deliver the Oakley software to DHS/ICE and perform specified support services for a one-year base period in return for payment of $900,000. It further provided for three one-year options at $899,186 per year, at the conclusion of which DHS/ICE was to have a perpetual license in the software. On September 28, 2004, DHS/ICE supplied an "essential use statement" to Northrop that included, *inter alia*, a description of the intended use of the Oakley software. This statement, apparently designed to facilitate third-party funding for the Oakley software, also indicated that funding for the Delivery Order would be provided from "[f]orfeiture funds obtained through criminal investigations."

On or about October 13, 2004, plaintiff timely delivered the Oakley software and, thereafter, performed all its obligations under the contract. DHS/ICE, however, continued to use the previously-utilized [] software and, for reasons unexplained, never, in fact, employed the Oakley software in an actual investigation. Nonetheless, DHS/ICE paid plaintiff $900,000 for the base year, using discretionary asset forfeiture funds supplied by the Department of Treasury's Executive Office For Asset Forfeiture. From September 30, 2004, to October 18, 2004, DHS/ICE executed three modifications to the Delivery Order. The second of these, issued on October 14, 2004, indicated that –

> It is expressly understood and agreed that the Department of Homeland Security shall use its best efforts to seek and utilize funding from all sources, and to request and reserve funds from the annual budget as a first priority designation to pay the required lease payments under this lease Agreement. If the lease is discontinued due to non-appropriation of funds . . . , the Department of Homeland Security agrees that it will not replace the software, nor pursue outsource contracting, with software which performs similar or comparable functions, of which the acquired

    software was intended to perform, for a period of the remaining full term of the lease or a period of twelve (12) months from the date the Department of Homeland Security discontinues its performance obligations under the lease, whichever is longer.

No similar language is found in the SWEP III contract.

    As the beginning of Fiscal Year 2005 approached, the Technical Operations Program Office at DHS/ICE (Tech Ops) designated the Oakley software as "mission critical" in its funding requests, although it did not specifically designate the Oakley software as a "first priority" for funding.  While Tech Ops made several attempts to secure funding for the Oakley software, those efforts ultimately proved unsuccessful.  Yet, Tech Ops managed to fund several other initiatives for Fiscal Year 2005 in an amount totaling $3,000,000.  On September 27, 2005, DHS/ICE informed plaintiff that it was not renewing the contract owing to a lack of available funds; formal notification of this was provided to Northrop on September 30, 2005.  On February 22, 2006, Northrop requested further information as to the agency's basis for this decision.  On April 14, 2006, DHS/ICE responded by indicating that the Oakley software contract was "one of a number of discretionary IT contracts that were considered to be of insufficient priority to continue to be funded."  In response, on September 21, 2006, plaintiff filed a claim under the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et seq.*, seeking $2,697,558, plus interest, and asserting that DHS/ICE had not complied with the contractual restrictions contained in the licensing agreement, as amended.  On December 29, 2006, the contracting officer denied this claim.

    On August 20, 2007, plaintiff filed suit in this court, asserting that defendant failed to comply with the contract's restrictions on its exercise of the options and had breached a covenant to seek funding for the options.  After fact discovery was completed, the parties filed cross-motions for summary judgment, which have now been fully briefed and argued.

## II.

    Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment.  *Id.* at 248.  However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

    When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to "determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004).  The court must determine whether the

evidence presents a disagreement sufficient to require fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *see also Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)). Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)); *see also L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005). Where, as here, a court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism. *Chevron U.S.A., Inc. v. Mobil Producing Tex. & N. Mex.*, 281 F.3d 1249, 1252-53 (Fed. Cir. 2002); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 34 (1st Cir. 2010); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010).

Issues involving contract interpretation often are resolved through summary judgment, because contract interpretation generally is a matter of law. *See NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *Govt. Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 n.1 (Fed. Cir. 1988); *Dick Pacific/GHEMM, JV ex. rel. W.A. Bottling Co. v. United States*, 87 Fed. Cl. 113, 126 (2009). This certainly holds true when a contract is clear and unambiguous on its face, making parol evidence antecedent or contemporaneous to the contract inadmissible to vary, contradict, or add terms to the contract. *See CW Gov't Travel, Inc. v. United States*, 63 Fed. Cl. 369, 390 (2004); *Vassar v. United States*, 63 Fed. Cl. 166, 171 (2004). Yet, it also remains true that "[t]o the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution." *Beta Sys. Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) (citing Samuel Williston, A Treatise on the Law of Contracts § 616, at 649, 652 (3d ed. 1961)); *see also Dick Pacific/GHEMM,* 87 Fed. Cl. at 126; *Burchick Constr. Co. v. United States,* 83 Fed Cl. 12, 20 (2008). As it turns out, the latter is the case here.

As a threshold matter, the court rejects defendant's claim that, under the Federal Acquisition Regulation (FAR), 48 C.F.R. § 2.101, it had broad, unfettered discretion not to "extend" the contract. While the cited provision, which was incorporated by reference in the contract, defines an "option" as a "unilateral right" by which the government "may elect to extend the term of the contract," it is well-accepted that such an option may, nevertheless, be limited by other contractual provisions. *See, e.g., Gov't Sys. Advisors*, 847 F.2d at 813; *Mun. Leasing Corp. v. United States*, 1 Cl. Ct. 771, 774 (1983); *Northrop Grumman Computing Sys., Inc. v. Gen. Servs. Admin.*, 06-2 B.C.A. ¶ 33, 324 (2006); *Varo, Inc.*, 70-1 B.C.A. ¶ 8099 (1969); *see also Beta Sys., Div. of Velcon Filters, Inc. v. United States*, 16 Cl. Ct. 219, 228 (1989).[3] Accordingly, the FAR provides defendant with no sockdolager here. Complicating matters further, it appears that what might, at first glance, be an option contract may, upon closer examination, be a multi-

---

[3] Defendant emphasizes the regulation's use of the word "unilateral." But, that word merely refers to an action that can be undertaken or done by one side to an agreement, and does not connote that such a right is necessarily unconditional. *See* XIX The Oxford English Dictionary 62 (2d ed. 1998).

year contract subject to termination if funds are unavailable.  *See Int'l Tel. & Tel. v. United States*, 453 F.2d 1283, 1292 (Ct. Cl. 1972); *see also* James A. Harley, "Multiyear Contracts: Pitfalls and Quandaries," 27 Pub. Cont. L.J. 555, 561-62 (1998).  Controversies over such questions commonly arise when a contractor's expectation to recover unamortized nonrecurring costs over the life of the contract is frustrated by the "early" conclusion of the contract.  *See id.*  When that happens, the court must determine whether that expectancy was actually part of the bargained for exchange.  *See Green Mgmt. Corp. v. United States*, 42 Fed. Cl. 411, 434 (1998); *Continental Collection & Disposal, Inc. v. United States*, 29 Fed. Cl. 644, 650 (1993).

There was no such bargain here, defendant claims.  Rather, it asserts, it negotiated for, and had, an unfettered right to decline the options available under the contract.  It recites, *inter alia*, language in the second modification, which states that "[i]f the lease is discontinued due to termination for convenience, non-appropriation of funds ***or non-renewal***, [DHS/ICE] agrees that it will not replace the software" (emphasis added).  But, language elsewhere in the supplemental leasing terms casts doubt on defendant's claim and implies the existence of limitations.  Consider, for example, defendant's obligation in the second modification to use its "best efforts" in seeking funding for the Oakley software.  Similar, albeit not identical, language has been held to cabin the government's nonrenewal discretion.[4]  Additionally, although the Delivery Order specifies a "twelve (12) month base year and three twelve (12) month option years," the supplemental leasing terms specify, at several points, a 36-month leasing period.[5]  It is unclear what, if any, limitations this language – which defendant concedes is ambiguous – imposes on defendant's discretion to discontinue the contract.  While one must assume that a consistent meaning can be divined from these sibylline leaves, that meaning is hardly apparent, at least at this juncture.

Contrary to discussions at oral argument, a limiting interpretation of the contract – under which defendant would have been obliged, in some circumstances, to renew the contract – would not necessarily run afoul of the Anti-Deficiency Act (ADA), 31 U.S.C. § 1341(a)(1)(A).  The ADA, of course, prohibits the obligation of funds in advance of an appropriation.[6]  But, while an interpretation of the contract that would contravene that statute would be disfavored, *see Cray*

---

[4]  *See Mun. Leasing Corp.*, 1 Cl. Ct. at 774 (Air Force promised "to use its best efforts to obtain appropriations of the necessary funds to meet its obligations and to continue this contract in force"); *Northrop Grumman*, 06-2 B.C.A. ¶ 33,324 (General Services Administration promised that it would "use its very best efforts to effect an extension of each lease . . . into subsequent fiscal years"); *see also S.A. Healy Co. v. United States*, 576 F.2d 299, 307 (Ct. Cl. 1978).

[5]  *See* Modification 1, Statement to Leasing Terms & Conditions ("This is a lease for a period of 36 months, subject to availability of annually appropriated funds."); *see id.* ("[stating Government's representation that Oakley software is] essential and critical to the Government's proper, efficient and economic operation for the full 36 month term of the lease agreement and any renewals thereof").

[6]  That Act states that "[a]n officer or employee of the United States Government . . . may not involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B).

*Research v. United States*, 44 Fed. Cl. 327, 333 (1999) (citing *Hobbs v. McLean*, 117 U.S. 567, 576 (1886)), some forms of binding options or multiyear contracts have been held not to violate this statute. *See RCS Enters. v. United States*, 57 Fed. Cl. 590, 594-95 (2003); *Cray Research*, 44 Fed. Cl. at 332; *see also Solar Turbines Int'l v. United States*, 3 Cl. Ct. 489, 494-95 (1983). The question then is whether this is such a contract – a question that can be answered only, in turn, when various other terms in the contract are clarified. Hence, the court finds that genuine issues of material fact exist as to whether the leasing terms impose limitations on defendant's right not to exercise an option, precluding summary judgment on this issue.

But, this is hardly the only dispute here over the meaning of the contract. The parties also disagree, for example, over what was meant by requiring DHS/ICE to "use its best efforts to seek and utilize funding from all sources, and to request and reserve funds from the annual budget as a first priority designation, to pay the required lease payments under this lease agreement." Like a Soma cube, this factual dilemma exists on a number of interlocking levels.

First, the parties cannot agree as to whether the "best efforts" requirement applied to the task of obtaining funds for future contract years, or merely required defendant to obtain funds to cover the cost of an option already invoked. While the latter position seems odd – as contracts do not ordinarily commit a purchaser to employ "best efforts" to find funding for what it has already acquired – the language of the provision is unclear and evidence explaining the purpose of this clause would undoubtedly aid in resolving this dilemma. Second, the parties disagree as to what was meant by the language requiring the agency to request and reserve funds for the software as "a first priority designation." Defendant asserts that this requirement was met when the agency categorized the Oakley software as "mission critical," but plaintiff espouses a stricter definition, under which the Oakley program – and only that program – was to be given "first priority." Of course, neither the Delivery Order, the three amendments, nor the SWEP III define what is meant by "first priority," again leaving the court to consider parol evidence as to the parties' intent in using this language, as well as, perhaps, the nature of the agency's budgeting process. Lastly, the parties strongly disagree as to whether DHS/ICE actually employed its "best efforts" in seeking funding to continue the contract. Resolving this question requires knowledge not only of what DHS/ICE did, but could have done, to obtain this funding – and while the record contains evidence of the former, it, as yet, sheds no light on the latter.[7] Consequently, with its many

---

[7] Typically, "best efforts" require some affirmative action made in good faith. *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1375 (Fed. Cir. 1999) ("best efforts requires 'that the party put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom'") (quoting *Macksey v. Egan*, 633 N.E.2d 408, 414 (Mass. App. 1994)); *see also* E. Allan Farnsworth, Farnsworth On Contracts § 7.17 (2d ed. 1998). This standard "cannot be defined in terms of a fixed formula; it varies with the facts and the field of law involved." *Pinpoint Consumer Targeting Servs., Inc. v. United States*, 59 Fed. Cl. 74, 82 (2003). Not surprisingly, courts often have held that disputes as to the application of "best efforts" clauses present fact issues that preclude summary judgment. *See Whitesell Corp. v. Whirlpool Corp.*, 2009 WL 3327241, at *3 (E.D. Mich. Oct. 13, 2009) ("the existence of good faith [in making best efforts] is normally a question of fact for the jury and should not be resolved

factual strata, this issue – more accurately viewed as a group of issues – is also not amenable to summary resolution.

Questions of fact also abound regarding the meaning of the nonsubstitution clause in the contract. That clause, recall, provided that DHS/ICE would "not replace the software, nor pursue outsource contracting, with software that performs similar or comparable functions, of which the acquired software was intended to perform." The parties are at odds over the meaning of the phrase "similar and comparable." Defendant asserts that products are not "similar and comparable" unless they are capable of performing all, or nearly all, the same functions. It thus contends that the [previously-utilized] software was not "similar and comparable" to the Oakley software because the former [], and thus could not []. Plaintiff, however, argues that products are "similar and comparable" as long as they serve the same basic purpose. In its view, then, the two software products at issue were "similar and comparable" because both could be used to intercept internet communications. Both formulations are tenable, given the sundry definitions of the terms "similar" and "comparable" – meanings that, individually and in conjunction, require different degrees of commonality.[8] The result is a quintessential case of contractual ambiguity, owing to this key language being reasonably susceptible of two or more interpretations.[9] That, in a nutshell, is what we have here. To crack that nut, the court again must have evidence of the intent behind the drafting and negotiating of these terms, thereby making summary judgment on

---

by summary disposition unless the evidence is undisputed or conclusive"); *Brown v. Buschman*, 2002 WL 389139, at *5 (D. Del. Mar. 12, 2002) (stating that "best efforts" is "a fact-intensive inquiry"); *Dogwood Assoc. LLP v. Douglas Elliman-Gibbons & Ives, Inc.*, 1993 U.S. Dist. LEXIS 12670, at *13 (S.D.N.Y. Aug. 30, 1993) (holding that use of "best efforts" in renewing leases presented triable issue of fact precluding summary judgment).

[8] *See* III The Oxford English Dictionary 590 (2d ed. 1998) (compare: "able to be compared, capable of comparison;" "worthy of comparison; proper, or fit to be compared"); XV The Oxford English Dictionary 496 (2d ed. 1998) (similar: "of the same substance or structure throughout;" "having a marked resemblance or likeness; of a like nature or kind;" "a thing or person . . . resembling another; a counterpart"). As the question was posed at oral argument – are an apple and orange "similar and comparable" because they are both fruit and can be eaten, or dissimilar and incomparable because of differences in color, taste, texture, and chemistry? The latter features might prove critical if, for example, one is baking a fruit pie, but not so if one is packing an unfussy child's lunch.

[9] As oft-noted by the Federal Circuit, "a contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (citations omitted). *See also E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004); *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999); *North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl. 158, 193-94 (2007).

this issue also inappropriate.[10] Moreover, the parties have widely differing views as to how the software programs in question functioned – differences highlighted in competing expert declarations, which themselves provide further indication that a trial is necessary.[11]

Finally, the parties disagree as to whether defendant breached an express warranty in the contract. This dispute centers on that part of the first modification which states that "[ICE] has represented to the [plaintiff] that the aforementioned Oakley software products are absolutely essential and critical to the Government's proper, efficient and economic operation for the full 36 month term of the lease agreement and any renewals thereof." Plaintiff asserts that this language creates an express warranty that was breached by defendant's decision not to fund the Oakley software. Not so, claims defendant. The parties agree that a breach of warranty occurs when "(i) the Government assured the plaintiff of an existence of fact; (ii) the Government intended that plaintiff be relieved of the duty to ascertain the existence of the fact for itself; and (iii) the Government's assurance of that fact proved untrue." *Oman-Fischbach Int'l v. Pirie*, 276 F.3d 1380, 1384 (Fed. Cir. 2002); *see also Kolar v. United States*, 650 F.2d 256, 258 (Ct. Cl. 1981). They disagree, however, as to whether each of these prongs was met here and, particularly, over whether defendant's representation regarding the essentiality of the Oakley software was an assurance of the "existence of [a] fact," let alone the sort of assurance that defendant intended plaintiff to rely upon. Without more telling evidence, the court is hesitant to conclude, at this summary stage, that defendant assumed the risk that no intervening events entirely outside its control, including the development of new intercept or [] technology that might render the software obsolete, would render the Oakley software less than "essential and critical" for the full term of the lease. In short, in the court's view, the plain language of the agreement is too ambiguous to establish *vel non* an obligation of this magnitude. Further evidence on this point is needed, again precluding the court from recognizing the existence of a warranty as a matter of law.

---

[10] Discerning the proper meaning of the nonsubstitution clause might also shed light on questions involving the extension of the lease. *See Frankenmuth Mut. Ins. Co. v. Escambia Cty., Fla.*, 289 F.3d 723, 727 n.5 (11th Cir. 2002) (noting that, under Florida law, the inclusion of a nonsubstitution clause in a contract may be viewed as "compelling the lessee to continue to appropriate funds throughout the full lease terms").

[11] *See Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 52 (2d Cir. 2007) (courts "must be wary of granting summary judgment when conflicting expert reports are presented"). This is particularly true where, as here, resolution of the dispute between the experts requires the court to weigh other evidence. *See Metro Life Ins. Co. v. Bancorp Servs. L.L.C.*, 527 F.3d 1330, 1339 (Fed. Cir. 2008); *SunTiger, Inc. v. Sci. Research Funding Group*, 189 F.3d 1327, 1336-37 (Fed. Cir. 1999); *Scharf v. United States Attorney Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979) (holding that resolution of issue of fact based on conflicting expert testimony is "not the court's function on summary judgment"); *Nat'l Westminster Bank PLC v. United States*, 69 Fed. Cl. 128, 147-48 (2005).

**III.**

Although there is the temptation, in pursuit of judicial economy, to think otherwise, "[t]he fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other." *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998). Rather, "[c]ross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the court must evaluate each motion on its own merits, taking care in each instance to view the evidence in favor of the nonmoving party." *Id.*; *see also Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005), *cert. denied*, 552 U.S. 1022 (2007). In the case *sub judice*, each party firmly believes that the facts which support its own claims are uncontested, but just as vigorously contests some of the facts underlying the other's claims. The cross-product of these positions yields numerous genuine questions of material fact as to whether defendant breached the specified provisions (and associated warranties) in the subject contract. Accordingly, the court must deny the parties' cross-motions for summary judgment.[12]

At the conclusion of oral argument, the parties jointly requested additional time in which to complete expert discovery in this case. The court indicated that it would grant this request.[13] On or before May 28, 2010, the parties shall file a joint status report proposing a schedule for the completion of expert discovery. Following the completion of that discovery, this case will be set down for trial.

**IT IS SO ORDERED.**[14]

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[12] Reinforcing this conclusion, during oral argument, plaintiff indicated that the court should consider its motion to be for partial summary judgment, reserving the issue of damages for a later time.

[13] The parties likewise requested additional time to conduct further factual discovery in this matter. The court, however, denied that request, noting that the parties have already received ten months in which to conduct that discovery.

[14] This opinion shall be publicly released, as issued, after June 4, 2010, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.