# In the United States Court of Federal Claims

No. 07-613C

(Filed Under Seal:  March 18, 2015)

Reissued:  April 6, 2015[1]

_____

| | |
|---|---|
| NORTHROP GRUMMAN COMPUTING SYSTEMS, INC.,<br><br>                 Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>                 Defendant. | \* <br> \* <br> \*   Contract; Motion for summary judgment;<br> \*   Software; Expectation damages; No harm<br> \*   incurred under delivery order; No damages;<br> \*   Maintenance expenses not recoverable; Motion<br> \*   for summary judgment granted.<br> \* <br> \* <br> \* <br> \* <br> \* |

_____

**OPINION**

_____

*David C. Aisenberg*, Looney, Cohen, *et al*., Boston, MA, for plaintiff.

*Martin Mason Tomlinson*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

Plaintiff, Northrop Grumman Computing Systems, Inc. (Northrop), brings this action seeking damages for the alleged breach of an agreement with the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE).  Under that agreement, Northrop leased surveillance software to ICE to be used in intercepting the internet communications of the targets of criminal investigations arising under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq*.  This case is pending before the court on defendant's motion for summary judgment on damages.  In its motion, defendant asseverates that Northrop has received all the compensation to which it is entitled under the

---

[1]  An unredacted version of this opinion was issued, under seal, on March 18, 2015.  The opinion issued today incorporates the parties' redactions (plaintiff did not propose any).  This redacted material is represented by brackets [ ].

contract at issue.  Having carefully reviewed the parties' briefs on this motion, the court holds that defendant is correct and it hereby **GRANTS** defendant's motion.

## I.     BACKGROUND

A brief recitation of the basic facts (many of which are stipulated) sets the context for this opinion.

Sometime in 2003, ICE's Technical Operations' National Program Manager for Internet Intercept identified the agency's need for Internet intercept software.  Tech Ops' mission is to provide field agents with the most innovative cutting edge electronic surveillance equipment and support in furtherance of ICE investigations and national security operations.  Prior to entering into the lease agreement below, DHS/ICE used other software to gather evidence, during a criminal investigation, of a subject's internet usage.  This software, however, could capture data only from [ ][2] and thus could not [ ].  In 2004, DHS/ICE decided that it needed software that could overcome this [ ] limitation.  After conducting market research, it chose Northrop's Internet Observer software, also known as the Oakley software (the Oakley software).  That software, [ ].

On September 24, 2004, ICE awarded Delivery Order COW-4-D-1025 (Delivery Order) to Northrop pursuant to a preexisting contract between ICE and plaintiff – Contract No. NAS5–01143.[3]  According to the Delivery Order, plaintiff was to lease the Oakley software to ICE and perform specific support services for a one-year base period in return for payment of $900,000, with three one-year options at $899,186 per option year – for a total contract price of $3,597,558 if all three options were exercised.[4]  On September 28, 2004, ICE provided plaintiff with an "essential use statement" that described the intended use of the Oakley software and was designed to facilitate third-party funding for the Oakley software.  From September 30, 2004, to October 18, 2004, ICE executed three modifications to the Delivery Order, adding, *inter alia*, a first priority clause, a best efforts clause, and a nonsubstitution clause.  On October 13, 2004, plaintiff delivered the Oakley software to defendant and was paid $900,000.

---

[2] *See* Daniel Garrie & Francis Allegra, "Plugged In: Guidebook on Software and the Law," § 3.3 (2013).

[3] The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002), created DHS.  The Act also consolidated the United States Immigration and Naturalization Service and the United States Customs Service into a newly-formed Bureau of Immigration and Customs Enforcement, which is now known as ICE.  ICE possesses its own Head of Contracting Activity ("HCA"), who, in turn, appoints contracting officers pursuant to agency regulations and the Federal Acquisition Regulation (Title 48, Code of Federal Regulations).

[4] The $899,186 for the first option year comprised $434,451 for the software license, $434,451 for annual software maintenance, and $30,284 for annual server maintenance.  If ICE had exercised the second option year, it would have paid $615,251 for the software license, $253,651 for annual software maintenance, and $30,284 for annual server maintenance.  If ICE had exercised the third option year, it would have paid $502,488 for the software license and $396,698 for annual software maintenance.

To finance the agreement, Northrop relied on ESCgov, with whom Northrop had a preexisting Purchase and Assignment Agreement.  The Purchase and Assignment Agreement stated that if Northrop assigned its interest in a government contract to ESCgov and that contract was "discontinued because of non-appropriation of funds, failure of the Government to exercise a renewal option under the Government Contract or termination for convenience" Northrop would "not be liable to ESCgov for any costs, expenses or lost profits, whatsoever," as long as Northrop complied with Provision 19(a) of the agreement.  Provision 19(a) provided, in relevant part: "[i]f ESCgov has substantial grounds for concluding that the actions taken by the U.S. Government constitute a sound basis for filing a claim with the Government, [Northrop] will use its best efforts to obtain the maximum recovery from the Government."  Northrop agreed to "diligently pursue such recovery" in cooperation with ESCgov.  If a claim or any subsequent litigation were successful, Provision 19(a) provided that ESCgov would have the first right to any damages awarded to Northrop.  But, if no money was recovered, Northrop would not have to repay ESCgov any amount.[5]

Consistent with the Purchase and Assignment Agreement, on October 22, 2004, ESCgov entered into Equipment Schedule No. 1, in which it agreed to pay Northrop $3,296,093 in exchange for Northrop's assignment to ESCgov of any payments it received under the Delivery Order.  Of this amount, ESCgov paid $2,899,710 directly to Oakley Networks for, *inter alia*, the purchase of the Oakley software licenses, "operational support hours," and "annual maintenance."  Also included in the total payment under Equipment Schedule No. 1 was a payment of $191,571 from ESCgov to Northrop, which represented Northrop's anticipated profit for its performance under the Delivery Order.

On October 22, 2004, Northrop also executed and delivered to Citizens Leasing Corporation, n/k/a RBS Citizens, N.A. (Citizens) a Consent to Assignment agreeing to ESCgov's plan to assign its rights under Equipment Schedule No. 1 to Citizens.  On October 25, 2004, Northrop executed an Instrument of Assignment assigning its rights and interests to any payments from the United States under the Delivery Order to Citizens.  On November 19, 2004, ESCgov executed an Assignment Agreement assigning its rights under Equipment Schedule No. 1 to Citizens in exchange for $3,325,252.16.

On September 30, 2005, ICE informed plaintiff that it would not exercise the first one-year option due to a lack of funds.  On September 21, 2006, Northrop filed a claim with the contracting officer pursuant to the Contract Disputes Act of 1978 (the CDA), 41 U.S.C. § 601, *et seq.* (current version at 41 U.S.C. § 7101, *et seq.*):

---

[5] Equipment Schedule No. 1 further specified that if the contracting officer denied a claim and Northrop elected not to pursue an appeal, Northrop would have to pay ESCgov the discounted balance of the contract.  However, if Northrop did pursue an appeal, "such suit . . . would be sponsored by and brought in the name of [Northrop], with [ESCgov] responsible for costs of such appeal."

to recover damages resulting from the Government's breach of the provisions of
the [Delivery Order] by failing to use best efforts to seek and utilize available
funding from all sources, by failing to reserve funds from the annual budget on a
first priority designation, and by replacing the software with another system
performing similar or comparable functions.

The claim requested damages of $2,697,558, because defendant's breach of contract entitled "a
contractor to be placed in as good a position as it would have had the breach not been committed
by the Government." Alternatively, Northrop asserted that "if the Government's breaches of the
Contract are found to constitute a Termination for Convenience, the amount of . . . damages owed
by the Government would be $2,674,032.80." A Northrop official certified that the claim was
"made in good faith," "accurate and complete" and stated an accurate damages amount for which
defendant was liable. The claim did not mention ESCgov, Citizens or any of the aforementioned
assignments. On December 29, 2006, the contracting officer denied this claim.

On August 20, 2007, Northrop filed a complaint in this court, asserting that defendant
breached the Delivery Order by failing to seek funding and exercise the options. The complaint
averred that, as a result of this breach, "Northrop Grumman is entitled to recover its damages as
described in the contract, including the payments not made under the Contract in the amount of
$2,697,558.00, plus interest." On May 20, 2010, the parties' cross-motions for summary
judgment were denied, and after supplemental discovery, trial was scheduled to begin on June 13,
2011. On May 13, 2011, defendant filed a motion to dismiss for lack of jurisdiction pursuant to
RCFC 12(b)(1), asserting that Northrop had submitted a claim to the contracting officer that failed
to provide adequate notice of the nature of the claim and to reveal that the claim was for the losses
of a third party. On May 27, 2011, plaintiff filed its response, and on June 2, 2011, defendant filed
its reply. On June 3, 2011, the court cancelled the aforementioned trial.

On June 15, 2011, the court granted defendant's motion to dismiss, finding that although
Northrop was the proper party to bring the claim, its letter to the contracting officer did not
provide adequate notice of the basis of its claim. *Northrop Grumman Computing Sys., Inc. v.
United States*, 99 Fed. Cl. 651 (2011). On July 20, 2011, plaintiff submitted a new claim to the
contracting officer that did include information on the assignments. On August 23, 2011,
Northrop appealed this court's dismissal order. On September 16, 2011, the contracting officer
purported to deny plaintiff's second claim. On September 21, 2011, plaintiff filed a new
complaint (Case No. 11-608) challenging the second denied claim. On November 16, 2011, this
court granted defendant's motion to dismiss the second complaint. *Northrop Grumman
Computing Sys., Inc. v. United States*, 101 Fed. Cl. 362 (2011). On January 10, 2012, Northrop
appealed that dismissal order.

On February 19, 2013, the Court of Appeals for the Federal Circuit issued an opinion
addressing both of plaintiff's appeals. *Northrop Grumman Computing Sys., Inc. v. United States*,
709 F.3d 1107 (Fed. Cir. 2013) (*Northrop Grumman II*). The Federal Circuit agreed with this
court's determination that the assignment from Northrop to ESCgov was not valid under the Anti-
Assignment Act, 31 U.S.C. § 3727, 41 U.S.C. § 15, and therefore Northrop was the proper party to
bring this claim. *Id.* at 1113. However, it reversed this court's dismissal of this case, finding that

the plaintiff did properly file a claim with the contracting officer. *Id.* The Federal Circuit also held that the appeal on Northrop's second claim was moot, since the court had jurisdiction over the original claim. *Id.*

After the case was remanded, the parties filed a joint status report in this court, in which defendant expressed its intention to file a motion for summary judgment on damages. On October 1, 2013, defendant filed a motion for summary judgment. Subsequent briefing on this motion has been completed. Oral argument was held on May 7, 2014.

## II.     DISCUSSION

We begin with common ground. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *Biery v. United States*, 753 F.3d 1279, 1286 (Fed. Cir. 2014). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Biery*, 753 F.3d at 1286; *Principal Life Ins. Co. & Subs. v. United States,* 116 Fed. Cl. 82, 88-89 (2014); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52; *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)). Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Principal Life Ins. Co. v. United States*, 2015 WL 461558, at *7-8 (Fed. Cl. Feb. 4, 2015); *Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

As a preliminary matter, the court rejects plaintiff's assertion that defendant's summary judgment motion is untimely. *Per contra*. Key facts underlying Northrop's claims were not disclosed by the latter during the extended discovery in this case. For example, plaintiff's initial disclosures and 2009 summary judgment motion did not reveal that it had received financing, let alone the details of the assignments to ESCgov and Citizens – even though discovery plainly should have revealed those details. Instead, the financing documents, and any details regarding

the specific arrangements, were not disclosed by plaintiff until March 7, 2011, several years after discovery was completed. That hardly gives plaintiff any basis to complain.[6]

In *Northrop Grumman II*, the Federal Circuit found it had jurisdiction over Northrop's claim even though plaintiff failed to notify defendant it had assigned its rights. 709 F.3d at 1110, 1113. Rather than treating that claim as waived, the Federal Circuit held that the contractor's assignment was nullified, leaving plaintiff as if there was no assignment. *Id*. at 1113. But, the Federal Circuit certainly did not suggest that Northrop should also be immunized from any arguments that defendant could have raised had Northrop met its discovery obligations, as required by this court's orders. Plaintiff thus should not be heard to complain that defendant is receiving a second or third bite at the apple, when, in fact, plaintiff sought to deny defendant its due in the first instance, as required by the rules. *Cf. Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053-54 (9th Cir. 2003) (Reinhardt, J., concurring) (citation omitted) ("A cliché like 'three bites at the apple' provides a formalistic rule that does not account for the particularities of an individual case.").

This leads us to defendant's banner claim – that plaintiff has not proven that any damages are owed. Defendant asserts that the undisputed facts show that Northrop has received all the compensation to which it is owed pursuant to the Delivery Order – that plaintiff is not entitled to any further expectancy damages based on its claim. Defendant is correct.

Expectation damages give the injured party "the benefits [it] expected to receive had the breach not occurred." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001); *see also Fifth Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed. Cir. 2008).[7] Conversely, "[i]t is . . . axiomatic that 'the non-breaching party should not be placed in a better position through the award of expectancy damages than if there had been no breach." *Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 543 (2005) (quoting *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003)); *see also Repub. Sav. Bank FSB v. United States*, 584 F.3d 1369, 1378-79 (Fed. Cir. 2009). The Federal Circuit has further elucidated – "[t]he benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Glendale*, 239 F.3d at 1380 (citing Restatement (Second) of Contracts, § 347); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1330 (Fed. Cir. 2002). As such, "[e]xpectation damages

---

[6] Indeed, contrary to plaintiff's claims, a decent case can be made that plaintiff should be liable for sanctions under RCFC 37(c)(1) for discovery violations or under RCFC 16 for plaintiff's violation of this court's discovery and pretrial order. *See Pyramid Real Estate Servs., LLC v. United States*, 95 Fed. Cl. 613, 622 (2010); *Multiservice Jt. Venture, LLC v. United States*, 85 Fed. Cl. 106, 112 (2008); *Pac. Gas & Elec. Co. v. United States*, 82 Fed. Cl. 474, 479-80 (2008).

[7] Similar views are expressed in the Restatement (Second) of Contracts, § 347, cmt. a (1981): "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." *See also Park Props. Assocs. v. United States*, 82 Fed. Cl. 162, 167 n.6 (2008).

are recoverable provided they are 'actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty.'" *Nat. Australia Bank v. United States*, 63 Fed. Cl. 352, 355 (2004), *aff'd in part, rev'd in part on other grounds*, 452 F.3d 1321 (Fed. Cir. 2006) (quoting *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001)); *see also North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl. 158, 213 (2007); *Cuyahoga*, 65 Fed. Cl. at 543.

The goal of contract damages thus is "to put the injured party in as good a position as that party would have been in if performance had been rendered as promised." 11 Corbin on Contracts § 55.3 (rev. ed. 2009); *see also Greenhill v. United States*, 92 Fed. Cl. 385, 399 (2010); *Anchor Sav. Bank, FSB v. United States*, 81 Fed. Cl. 1, 85-86 (2008). It is not to provide the contracting party with a windfall. Plaintiff seeks the latter – it seeks expectation damages that exceed the amount that defendant was obliged to pay under the contract. ESCgov expressly agreed to pay Northrop $3,296,093 for which Northrop agreed to assign the rights of all payments it received from ICE under the Delivery Order. There is no dispute that this amount was, in fact, paid to Northrop by ESCgov. The contract between ESCgov and Northrop further makes clear that if defendant were to terminate the contract for convenience or declined to exercise a renewal option, Northrop was not liable for costs, expenses, lost profits or other damages incurred or suffered by ESCgov. Northrop was paid the amount it expected to be paid for its performance under the Delivery Order. It is unable to identify any way that it, as opposed to ESCgov or Citizens, was harmed by defendant's actions.[8]

Plaintiff, however, argues that defendant is seeking a windfall – that plaintiff was harmed because defendant did not make payments for the three unexercised option years under the Delivery Order. But, there is no indication that, under the contract terms, plaintiff was entitled to receive those payments. Contrary to plaintiff's claims, ICE paid in full for the one year it had the license for the software in question, and did not use the software thereafter. Had ICE exercised all three options, Northrop would not have received any further payments – those payments had been assigned to ESCgov. ESCgov's payment of $191,571 represented Northrop's anticipated profit for its anticipated performance under the Delivery Order. And Northrop, indeed, received that payment from its finance company, ESCgov. Northrop reaped the benefit of the bargain it negotiated – it is entitled to nothing more from defendant. *See Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1324 (Fed. Cir. 2007).[9]

---

[8]  Northrop asseverates that the payments it received from its finance company should not be treated as payments for Northrop's performance pursuant to the Delivery Order. It asserts, instead, that "[i]t is entitled to proceed to trial to prove its breach of contract and breach of warranty claims and seek damages in the principal amount of $2,697,558 for the amounts that the Government failed to pay." The amount cited by plaintiff represents the sum of the three payments defendant would have made if it exercised the three option years. The problem is, what plaintiff seeks is not a figure to which it is entitled.

[9]  Plaintiff repeatedly asserts that it was harmed solely because defendant did not make payments for the three unexercised option years. *See, e.g., Plaintiff's Responding Brief* at 14 ("The Government's arguments are also misguided because they focus on how much money

Likewise, plaintiff is not entitled to any damages associated with software and server maintenance beyond that which the Delivery Order required for the base year.  Fundamentally, Northrop cannot recover damages for any software and server maintenance work that was not performed under the Delivery Order – software and server maintenance that was unnecessary in the out-years based on ICE's decision not to exercise the first option.  "The contractor may not recover for work not performed."  *H.B. Nelson Constr. Co. v. United States*, 87 Ct. Cl. 375, 385 (1938), *cert. denied*, 306 U.S. 661 (1939).  This court cannot permit otherwise.

## III.   CONCLUSION

The court will not gild the lily.  The court concludes, as a matter of law on essentially undisputed facts, that defendant has demonstrated that plaintiff is not entitled to any damages under the Delivery Order in question or otherwise.  Accordingly, the court **GRANTS** defendant's motion for summary judgment.  The Clerk shall dismiss plaintiff's complaint.

**IT IS SO ORDERED**.[10]


s/Francis M. Allegra
Francis M. Allegra
Judge

---

Northrop Grumman has received and what obligations it has to parties other than the Government, rather than who made the payment and why.").  But, like Ol' Dobbins, Northrop seemingly dons blinders as to whom was entitled to receive such payments – and from the fact that there is no indication that it was actually harmed in any way, shape or form by defendant's decision not to exercise its options.

[10]  The court intends to unseal and publish this opinion after April 3, 2015.  On or before April 3, 2015, each party shall file proposed redactions to this opinion, with specific reasons therefor.